Filed 6/27/14  In re Emily S. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re EMILY S., a Person Coming Under the Juvenile Court Law. | B253262 (Los Angeles County Super. Ct. No. MJ22210) |
| THE PEOPLE, Plaintiff and Respondent, v. EMILY S., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Denise McLaughlin-Bennett, Judge.  Affirmed.

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Emily S., appeals from the order of wardship (Welf. & Inst. Code, § 602) entered as a result of the juvenile court's finding she committed grand theft of personal property, a felony, in violation of Penal Code section 487, subdivision (a). The court placed Emily S. at home on probation. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.

    a. *The prosecution's case*.

During December 2012 and January 2013, Barbara . lived on Minstrel Drive in the City of Palmdale. Barbara G. lived at the house with her foster children, 17-year-old Emily S. and Emily S.'s younger brother, Michael S. Just before Christmas 2012, Barbara G. noticed a pair of her earrings were missing. Then, just after Christmas, but before the New Year holiday, Barbara G. realized her father's watch was missing. The earrings, which had been a gift from her father, were worth between $900 and $1,000. The watch, which Barbara G. was saving for her brother, had been appraised at between $950 and $1,000. Barbara G. had last seen her earrings sitting on the kitchen counter, next to the coffee pot. She had last seen the watch in the drawer in her nightstand in her bedroom. Anyone who lived at the home had access to the earrings and watch.

Barbara G. had noticed her earrings were missing after several of Emily S.'s friends had been at the house visiting. Although they all had been in the kitchen at one time or another, Barbara G. had not actually seen anyone take the earrings. Barbara G. did remember that a woman named Latanya, who was Emily S.'s father's girlfriend, had stayed at the house around the holidays, but Barbara G. believed Latanya had been there after Barbara G. had noticed the watch and earrings were missing.

After the New Year, Emily S. was staying with her grandfather for a couple of days. Emily S. was supposed to be back at Barbara G.'s house by a particular time and, when she was late, Barbara G. called to ask her when she was coming home. During their conversation, Barbara G. asked Emily S. about the missing earrings and watch. Emily S. told Barbara G. the earrings were in Emily S.'s purse on the couch. However, when Barbara G. checked, the earrings were not there. Barbara G. told Emily S. the

2

earrings were not in her purse and when she then asked Emily S. about the watch, Emily S. said "f-you" and hung up on Barbara G.

During a second conversation, Emily S. told Barbara G. she "wasn't going to get the watch back because [Emily S.] had already got rid of it. . . . [Emily S.] didn't say anything about the earrings." As of the time of trial, Barbara G. had recovered neither the earrings nor the watch. Moreover, she was the only person who had heard Emily S. say she had taken them.

Although Barbara G. had no ill feelings toward Emily S., she had at times had difficulties with her.[1] In addition, Barbara G. had been having "issues" with Emily S.'s father regarding Emily S.'s brother, Michael S. There existed some animosity between Barbara G. and Emily S.'s father regarding the fact Michael S. was living at Barbara G.'s home.[2]

On January 3, 2013, Barbara G. spoke with Deputy Sheriff Jonathan Dillon regarding the theft of the earrings and the watch. Barbara G. told the deputy she had been told by Emily S. the watch had been taken to a watch repair shop on the corner of Laurel Canyon Boulevard and Magnolia Boulevard in North Hollywood. On New Year's Day, Barbara G. was told by the foster mother of one of Emily S.'s siblings, a woman named Tabatha, as well as by Latanya, that Emily S. had pawned Barbara G.'s watch in the North Hollywood area. Barbara G. then "convey[ed] this information to" an officer from the Los Angeles Police Department. Although Barbara G. had been in the area after the New Year holiday, she had not gone to the shop. She believed, even if the watch had

---

[1]     Emily S. was on probation and had refused to go to school. Barbara G. had at times had school police come and get Emily S., had gone through "wrap around" and ultimately had to have "intervention."

[2]     As a foster parent for Emily S., Barbara G. had received money from the state to care for her. Since Emily S. was considered a "problem child," Barbara G. received $1,300 a month. Emily S. had since, however, become 18 years of age and Barbara G. no longer received money for her. Barbara G. still, however, received $1,300 per month for Emily S.'s younger brother, Michael S.

been left there, by the time she went back to the area so much time had passed "the watch would be [gone]."

          b. *Defense evidence*.

George S. is Emily S.'s father. George S. knew Barbara G., who had custody of Emily S. until Emily S. had her 18th birthday.[3] After her birthday, as far as George S. knew Emily S. had been staying with Barbara G. during the week and staying with him on the weekends. George S. believed Emily S. and Barbara G. had a tumultuous relationship and fought almost every day. He "got the calls." However, when she still had custody of Emily S., Barbara G. had told George S. she wished to "keep Emily in order to get the foster parent money." Moreover, Barbara G. had indicated she could "make more money from the state if Emily [were] labeled a problem child." George S. did not believe Emily S. was a problem child and thought Barbara G., whom he had known for 15 years, was a "gossiper." He generally did not believe things Barbara G. told him. In addition, he thought Barbara G. was lax with Emily S. He believed Barbara G. gave to Emily S. alcohol and marijuana and let Emily S.'s boyfriend stay in the house with her.

Although he believed his daughter, Emily S., was not a problem child, George S. knew that, at age 16, cases against her for possession of a controlled substance or narcotic and petty theft had been dismissed. George S. was not aware of the fact that, on approximately February 12, 2012, a case for theft of property valued at less than $400 had been brought against Emily S., then dismissed.

Shortly after January 3, 2013, George S. saw Barbara G.'s watch. The watch was sitting in his girlfriend's, Latanya's, lap. Latanya had told George S. she had "snaked the watch from [Barbara G.'s] house." Latanya had initially gone to Barbara G.'s home because George S. had "kicked her out and . . . [Barbara G.] [had taken] her in." Latanya had then returned to George S.'s home and shown him the watch. George S. had called Barbara G. and told her he knew where her missing watch was. At some later point,

---

[3]      According to the probation report, Emily S. was born in June 1995.

"Latanya just went crazy" and decided to go back to Barbara G.'s house. Latanya told George S. she had stolen some checks from a car dealer and, in return for giving her the watch back, Barbara G. was going to cash the checks for her.

When asked whether he had "a pretty strong level of animosity against Barbara [G.] because she was taking care of his son[,]" George S. responded he had "great gratitude." George S. continued: "I don't know what animosity is, but I'm really grateful for Barbara. In fact . . . me, Barbara, and the social worker[,] we hushed up Barbara's abuse to Emily because we were afraid it would jeopardize Michael's custody with Barbara." George S. then gave the name of the social worker.

Tabatha K., a foster parent who had custody of one of Emily S.'s siblings, Matthew P., had not wished to testify in this matter. However, Tabatha K. claimed Barbara G. had threatened to contact the Department of Social Services and make accusations against Tabatha K. if she would not testify on Barbara G.'s behalf. According to Tabatha K., Barbara G. believed Emily S. had stolen Barbara G.'s watch and had told Tabatha K. about it. Barbara G., accordingly, wanted Tabatha K. to testify Emily S. had told her she had taken Barbara G.'s watch. Although Tabatha K. indicated she had no idea what had happened to the watch, she had, during one conversation with Barbara G., told Barbara G. there was a pawn shop in North Hollywood "where [Emily S. and others] would go to [have] . . . jewelry [redone]."

        c. *Rebuttal.*

It was stipulated that if Los Angeles County Deputy Sheriff Jonathan Daily were called to testify he would have stated that on or about January 3, 2013, Barbara G. told the deputy Emily S. had told Barbara G. she had pawned a watch at a shop at the intersection of Laurel Canyon Boulevard and Magnolia Boulevard in North Hollywood. It was further stipulated that should Los Angeles Police Department Detective Kenneth Hoover be called to testify he would state that on or about March 25, 2013, "the detective drove by the intersection of Laurel Canyon Boulevard and Magnolia Boulevard in North Hollywood and confirmed . . . there were no pawn shops located [there]."

5

Emma Kazaryan is a children's social worker. At one time, Emily S. was "under [Kazaryan's] caseload." Kazaryan also knew Emily S.'s father, George S. Kazaryan, George S. and Barbara G. never met for the purpose of hiding "any sort of abuse committed by Ms. [G.] against Emily [S.]"

Kazaryan indicated, although part of her work had been to provide reunification services between Emily S. and her father, George S., it had been difficult because George S. "has mental health issues." George S. would become angry with and threaten Kazaryan because his children had been detained and, at one hearing, the juvenile court had recommended termination of family reunification services. The court made the recommendation because, although George S. had been directed to attend drug counseling, address his mental health issues and have his psychotropic medications reviewed, he had failed to comply with any of the orders. At that point he had become angry with Kazaryan and had made derogatory comments about her, including some about her religion. However, Kazaryan had never had a conversation with George S. and Barbara G. about allegations Barbara G. had provided alcohol and marijuana to Emily S.

Barbara G. testified she never gave to Emily S. marijuana and only once, with her father's approval, had allowed her to have "a sip" of an alcoholic beverage. Barbara G. allowed Emily S.'s boyfriend to come to her home. However, he "stayed on the couch" and was not "allowed up in [Emily S.'s] room."

Barbara G. never met with George S. and Kazaryan "to discuss hiding any actions of abuse [she had] committed on [Emily S.]" Barbara G. also never gave anyone permission, including George S.'s girlfriend, Latanya, to take her earrings or her watch. Neither did she "barter or trade fraudulent checks for [the] items."

Barbara G. had met Tabatha K. through Emily S.'s and Michael S.'s mother. Tabatha K. had been the individual who had told Barbara G. the location of the watch shop in North Hollywood. Barbara G. had not, however, contacted Tabatha K. "to get her to testify that Emily [S.] had pawned the property." Although Barbara G. had spoken to Tabatha K. after the last court date, it had been regarding a hearing which was to be

6

held pursuant to guardianship. Tabatha K.'s potential testimony with regard to Emily S. "never came up."

When Barbara G. was shown two maps, one showing "the Logos Jewelry Shop on Laurel Canyon Boulevard" by Magnolia, Barbara G. indicated the map showed something which appeared to be a window with the words "jewelry and watch repair" on it. In addition, there was a sign which indicated the shop was "open." Barbara G. stated the map depicted the location of the watch shop she had referred to earlier.

Barbara G. believed either Latanya or Tabatha K. had told her Emily S. had taken the watch to a repair shop at Laurel Canyon Boulevard and Magnolia. Latanya never told Barbara G. she had taken the watch and Barbara G. had never seen Latanya wearing the watch. With regard to Tabatha K., she had told Barbara G. the watch repair and jewelry store at Laurel Canyon and Magnolia was "where Emily [usually took] her stuff to sell and [it was ] . . . likely [the] watch was there."

2. *Procedural history.*

In a petition filed on April 17, 2013 pursuant to Welfare and Institutions Code section 602, it was alleged Emily S. had committed the crime of grand theft of personal property in violation of Penal Code section 487, subdivision (a), a felony, on or between December 30, 2012 and January 3, 2013, by unlawfully taking "money and personal property of a value exceeding Nine Hundred Fifty Dollars ($950), to wit [a] Movado Watch and diamond earrings[,] the property of Barbara [G.]."

At a hearing held on October 15, 2013, defense counsel made a motion to dismiss the matter, arguing the evidence presented by the People had been insufficient to support the charges. After the parties argued the matter, the juvenile court indicated it had found the victim, Barbara G., to be credible and she had "testified credibly about the circumstances surrounding the time period when the items were missing." The juvenile court continued: "It appears to this court . . . that the minor made an admission to [Barbara G.] with respect to . . . both items. So at this point in time there appears to be a showing that a crime has been committed and that the minor may have been the one to [have] commit[ted] that crime. So the motion is denied."

7

Given the content of some of the testimony given by Emily S.'s father, George S., the trial court appointed counsel to represent him during the proceedings.  However, when George S. completed his testimony, counsel was dismissed.

After all the evidence had been presented and the juvenile court had heard argument, the court determined the People had met their burden of proof  and found the allegations in the petition true.  The juvenile court found the crime alleged, grand theft of personal property, to be a felony and declared Emily S. to be a person described by Welfare and Institutions Code section 602.  The matter was then put over to December 10, 2013 for disposition.

At proceedings held on December 10, 2013, the juvenile court indicated it had read and considered Emily S.'s probation report.  The juvenile court then made the following findings:  "The minor is declared a ward of the court pursuant to Welfare and Institutions Code section 602.  The minor's care, custody, control and conduct is hereby placed under the supervision of the Probation Department.  The minor is permitted to remain in the home of her parents under [various] terms and conditions . . . ."  The juvenile court then continued the matter to June 10, 2014 for a progress report.

Emily S. filed a timely notice of appeal from the juvenile court's order on December 10, 2013.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record.

By notice filed April 11, 2014, the clerk of this court advised Emily S. to submit within 30 days any contentions, grounds of appeal or arguments she wished this court to consider.  No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities.  (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

**DISPOSITION**

The order of wardship is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



KITCHING, J.

We concur:


KLEIN, P. J.



CROSKEY, J.

9